UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM JOHN McMILLEN IV,<br><br>Plaintiff,<br><br>v.<br><br>ANDREW SAUL, Commissioner of Social Security,<br><br>Defendant. | No. 1:18-cv-01115-GSA<br><br>**ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF COMMISSIONER OF SOCIAL SECURITY AND AGAINST PLAINTIFF** |

## I.    __Introduction__

Plaintiff William John McMillen IV ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability insurance benefits pursuant to Title II of the Social Security Act.  The matter is currently before the Court on the parties' briefs which were submitted without oral argument to the Honorable Gary S. Austin, United States Magistrate Judge.[1]  *See* Docs. 15, 16 and 17.  Having reviewed the record as a whole, the Court finds that the ALJ's decision is supported by substantial evidence and applicable law. Accordingly, Plaintiff's appeal is denied.

///

///

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  *See* Docs. 7 and 8.

## II. Procedural Background

On March 19, 2014, Plaintiff filed an application for disability insurance benefits alleging disability beginning March 10, 2014. AR 10. The Commissioner denied the application initially on June 30, 2014, and again following reconsideration on August 14, 2014. AR 10, 114.

On August 28, 2014, Plaintiff filed a request for a hearing. AR 10. Administrative Law Judge Richard T. Breen presided over an administrative hearing on August 10, 2017. AR 41-93. Plaintiff appeared and was represented by an attorney. AR 41. On August 21, 2017, the ALJ denied Plaintiff's application. AR 10-21.

The Appeals Council denied review on June 21, 2018. AR 1-5. On August 17, 2018, Plaintiff filed a complaint in this Court. Doc. 1.

## III. Factual Background

### A. Plaintiff's Testimony

#### 1. Agency Hearing

Plaintiff (born April 19, 1985) lived with his spouse and four children in California City, California. AR 60. He completed high school and thereafter worked as a laborer performing heavy construction work building and maintaining roads and bridges. AR 61. His duties included such things as shoveling asphalt grindings, lifting and placing sandbags, and transporting and installing asphalt in areas that trucks could not reach. AR 62-63. From 2009-2014, Plaintiff worked as a field inspector, checking finished paving as well as tools and equipment. AR 63.

Although Plaintiff drove short distances near his home, his spouse generally drove him on longer trips. AR 60. At most, he could stand and walk for 30 minutes in an eight-hour work day. AR 72. He could sit for 30 to 40 minutes before needing to lay down. AR 78. He could lift two gallons of milk and use his hands and fingers. AR 77. Plaintiff had difficulty bending over to wash his legs and feet and while looking up to shave. AR 77. Because Plaintiff had difficulty reaching his lower extremities, his wife helped Plaintiff dress. AR 77. Plaintiff did very little housework but could vacuum and wipe down counters. AR 78. He could not do dishes or laundry because he could not bend. AR 78. Plaintiff's medications made him drowsy, but pain

kept him awake at night.  AR 80.  He had dizzy spells at least once a month.  AR 80.

Plaintiff continued working after his initial diagnosis of multiple sclerosis.  AR 68.
Ultimately, he began passing out at work experiencing numbness in his hands and feet, and
finding himself unable to move or stand because of his back and neck problems.  AR 68.  He
could not carry his tools.  AR 70.  Severe pain prevented him from doing even less physical work.
AR 70-71.

Because he lived three hours from Los Angeles, Plaintiff had not returned to the UCLA
neurologist since 2015.  AR 67.  He had been unable to find a neurologist near his home.  AR 74.
Finding that shots were ineffective at controlling his pain, Plaintiff had discontinued seeing his
pain management specialist, Dr. Emenike, in 2015 or 2016.  AR 73.  Similarly, Plaintiff had
discontinued seeing Dr. Del Rosario in favor of getting the same medications from his primary
care physician.  AR 73.

**2.  Adult Function Report**

In an Adult Function Report dated April 18, 2014, Plaintiff reported spending most of his
day lying on the couch watching television, or napping until his children returned from school
and the family went to the children's practices.  AR 314.  In addition to the daily activities to
which he testified, Plaintiff reported feeding the family's animals and taking out the trash
depending on his pain level.  AR 316.  He shopped every two weeks for about three hours.  AR
317.  Plaintiff's impairments affected his ability to lift, squat, bend, walk, stand, reach, sit, kneel,
climb stairs, see, complete tasks, concentrate and use his hands.  AR 319.

On a fatigue questionnaire of the same date, Plaintiff reported first experiencing fatigue in
early 2012.  AR 323.  He napped for one to two hours daily.  AR 324.

**B.  Medical Records**

The record includes examination notes of Plaintiff's primary care physician, Kain Kumar,
M.D., Ph.D., from November 2012 through July 2015.  AR 458-70, 514-18.  Dr. Kumar's notes
are brief and frequently illegible.  By November 2012, Plaintiff was reporting severe back pain
and finger numbness.  AR 464-65.  As a result, Dr. Kumar ordered the November 29, 2012

3

magnetic resonance imaging studies that indicated areas of demyelination and Dawson's fingers[2] in Plaintiff's brain.  AR 466-70.

On January 23, 2013, neurologist Vijay Shanmugam, M.D., examined Plaintiff as a new patient.  AR 411-13.  Plaintiff reported recurrent neck pain beginning six years prior that had become constant in the last two years; bilateral blurry vision; twice passing out; migraine headaches; and, intermittent numbness of the second and third fingers.  AR 411.  Dr. Shanmugam's examination of Plaintiff was normal in all regards.  AR 412.  The doctor summarized:

> Patient's history and exam not consistent with MS.  The neck pain appears to be musculoskeletal and he has a history of vasovagal syncope.   Visual acuity is 20/25 in both eyes without red desaturation.

AR 412.

On January 30, 2013, Dr. Shanmugam administered a visual evoked potential test.  AR 414.  Plaintiff's responses were abnormal with prolonged latency on both sides suggestive of demyelinating optic neuropathy.  AR 414.  In a follow-up examination on February 27, 2013, the doctor reported that the November 2013 magnetic resonance imaging showed white matter lesions suggestive of demyelination but no cervical spine lesions.  AR 409.  Because Plaintiff's MRI and EP abnormalities that indicated demyelination but were not specific for multiple sclerosis, Dr. Shanmugam referred Plaintiff to a multiple sclerosis specialist at UCLA.  AR 405, 407.

Stephanie Tankou, M.D., Ph.D., examined Plaintiff at UCLA on April 27, 2013.  AR 4-39.  Except for mild decreased sensation to pinprick in a stocking distribution at Plaintiff's feet, the physical examination was normal.  AR 435-36.  Dr. Tankou wrote:

> 27-year-old right-handed male with history of headache with migrainous features who presents with a constellation of symptoms including 1 year [history of] worsening daytime fatigue, intermittent episodes of numbness in the third and fourth fingers bilaterally, and heavy sensation in both legs that are concerning for multiple sclerosis.  The patient underwent a brain MRI study that showed

---

[2] "Dawson's fingers" are elongated, flame shaped, hyperintense lesions perpendicular to the walls of lateral ventricals which correspond to areas of perivenous inflammation.  www.ncbi.nih.gov/pms/articles/PMC3934317/ (accessed December 3, 2019).  These lesions are typical of multiple sclerosis.  *Id.*

4

Dawson fingers. We were not able to review his C-spine MRI, but T-spine MRI also shows area of hyperintensity along the left side that is suspicious for a demyelinating process and could explain abnormal sensation in his legs. The patient does meet the criteria for clinically definite multiple sclerosis as some of the lesions were enhancing and others were not and the lesions were in different areas; this fulfill[s] the criteria for dissemination in time and space. He has also been complaining of neck pain radiating to his back which is sounding more like musculoskeletal type of pain, especially because it is exacerbated by movement, but since we have not had the opportunity to review the C-spine MRI, we can't completely rule out the possibility that his neck pain is secondary to an underlying C-spine disease/abnormality. The blurry vision episodes of vertigo were lasting less than 24 hours, they would not qualify as multiple sclerosis symptoms.

AR 436-37.

Following a second appointment with Dr. Tankou,[3] Plaintiff began injecting Copaxone[4] on June 17, 2013. AR 422, 425. When Plaintiff saw Dr. Tankou on July 27, 2013, he was experiencing a skin reaction (swelling and erythema) at the injection sites, particularly at the hips and thighs. AR 425. Plaintiff continued to experience fatigue, bilateral numbness of the thumbs and third and fourth fingers, and soreness in his lower extremities. AR 425. Dr. Tankou reviewed Plaintiff's November 2012 C-spine MRI and observed no clear area of demyelination. AR 425. She encouraged Plaintiff to discontinue Vicodin and Soma, both of which had sedating effects that could exacerbate Plaintiff's fatigue. AR 427.

On October 29, 2013, orthopedist Woojae Kim, M.D., examined Plaintiff to evaluate complaints of upper and lower back pain. AR 444-46. The physical examination was generally normal except for tenderness to palpation in the bilateral thoracic paraspinal muscles. AR 445. Magnetic resonance imaging of Plaintiff's lumbar spine (October 2013) revealed a broad-based disk protrusion with annular fissure and spur at L5-S1 with bilateral facet arthropathy probably touching both L5 exiting roots; a 2-3 mm disk bulge with facet hypertrophy at L3-L4 and L4-L5; and, trace facet joint effusions at L4-L-5 and L5-S1. AR 445-46, 449-50. Lumbar spine

///

---

[3] Dr. Tankou prescribed physical therapy to address Plaintiff's neck pain. AR 681. The administrative record includes no evidence that Plaintiff ever participated in physical therapy.
[4] Copaxone (Glatiramer injection) is injected subcutaneously to treat adults with various forms of multiple sclerosis. www.medlineplus.gov/druginfo/meds/a603016.html (accessed December 4, 2019). Copaxone is an immunomodulator that stops the body from damaging its own nerve cells (myelin). *Id.*

imaging was unremarkable.  AR 451-52.  Dr. Kim administered trigger point injections to the thoracic paraspinous [*sic*] bilaterally and prescribed Baclofen[5] to be taken as needed.  AR 446.

Dr. Kim again administered trigger point injections on November 12, 2013.  AR 447-48. Although Plaintiff's back pain had improved following the prior injections, the doctor remained concerned about Plaintiff's neck pain.  AR 448.  He diagnosed cervical radiculopathy and bilateral trapezius myofascial pain.  AR 448.

Ophthalmologist Reginald Sampson, M.D., evaluated Plaintiff's complaints of blurry vision in June 2014.  AR 478-93.  Plaintiff's visual acuity was 20/25, and he had astigmatism. AR 479, 481.  Dr. Sampson prescribed glasses.  AR 481.

In the emergency department of Antelope Valley Hospital on October 14, 2014, Plaintiff was treated for paranoia and agitation following an argument in which he threatened his wife. AR 540.  Emergency room medical personnel diagnosed depression and psychosis with mild delusional disorder (paranoia).  AR 541.  He was discharged and returned home the same day. AR 547.

In November 2014, Plaintiff returned to UCLA where he was treated by Andrew M. Wilson, M.D.  AR 681-83.  Dr. Wilson noted that since Plaintiff's last appointment in July 2013, Plaintiff continued to experience fatigue and intermittent paresthesia but had no MS-like attacks. AR 681.  Plaintiff experienced blurred vision and difficulty swallowing in the mornings, which improved as the day passed.  AR 681.  Plaintiff reported that he was hospitalized for a "mental breakdown" after his wife left him, taking their three young children.  AR 681.  Magnetic resonance imaging of Plaintiff's brain, cervical spine and lumbar spine in October 2014 revealed no new lesions.  AR 681.  Following a physical examination of Plaintiff, Dr. Wilson opined that Plaintiff's multiple sclerosis was stable.  AR 682.  He recommended that Plaintiff reduce his use of Norco and Ambien as tolerated.  AR 683.

Plaintiff received pain management services from Emmanuel Emenike, M.D., from February through July 2015.  AR 623-58.  Dr. Emenike prescribed Norco and periodically

---

[5] "Baclofen acts on the spinal cord nerves and decreases the number and severity of muscle spasms caused by multiple sclerosis or spinal cord diseases.  It also relieves pain and improves muscle movement." www.medlineplus.gov/druginfo/meds/a682530.html (accessed December 4, 2019).

administered injections to relieve lumbar pain radiating to Plaintiff's lower extremities. AR 23-58.

Plaintiff did not keep his March 2015 appointment at UCLA. AR 684.

The record includes notes concerning Plaintiff's psychiatric treatment by Roy Del Rosario, M.D., from February 2015 to December 2016. AR 526-33, 670-71, 673-75. In an undated intake interview Plaintiff disclosed daily consumption of four alcoholic beverages. AR 534. His psychiatric history included anxiety, depression, psychosis and schizophrenia. AR 534. Dr. Del Rosario noted appropriate grooming and observed no loss of thought processes, intact associations, thoughts within normal limits, full orientation, intact recent and remote memory, impaired attention span and concentration, and anxious and depressed mood and affect. AR 535. Dr. Del Rosario's diagnosis is largely illegible except for his notation of a GAF score of 40.[6] AR 536.

On June 10, 2015, Plaintiff was treated for a broken toe and injured foot at Palmdale Regional Medical Center (PRMC). AR 556-61. Plaintiff experienced a tunneling of vision, dropped a clay pot on his foot, recovered, then blacked out and fell into a fountain striking his face. AR 556.

On July 26, 2015, Plaintiff was treated at PRMC for severe back pain following a sneeze. AR 562-65. Emergency personnel diagnosed a possible herniated lumbar disc and prescribed Motrin and Norco for pain. AR 564-65.

When Plaintiff saw Dr. Wilson in October 2015, he reported that his orthopedists were considering surgery to address numbness and weakness of Plaintiff's left leg, thought to be caused by a pinched nerve. AR 684. Since his last appointment Plaintiff had experienced no MS-like attacks such as change in vision, bowel/bladder disfunction or other extremity changes. AR 684. Plaintiff reported that stress from his divorce was disturbing his sleep, but he had family support and a new girlfriend. AR 684. Dr. Wilson encouraged exercise to improve Plaintiff's

---

[6] The Global Assessment of Functioning (GAF) scale is a rating from 0 to 100 and considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. *Diagnostic and Statistical Manual of Mental Disorders*, 32-35 (4th ed. American Psychiatric Association 1994). A GAF of 31-40 corresponds to some impairment in reality testing or communication (e.g., speech is at times illogical, obscure or irrelevant) or major impairment in several areas (e.g., stays in bed all day; no job, home or friends). *Id.*

quality of life and ease disease progression.  AR 686.  He also encouraged Plaintiff to minimize

stress and adapt good coping mechanisms.  AR 686.

    In December 2016, Firooz Amjadi, M.D., performed a C5-C6 anterior cervical

decompression and instrumented fusion of Plaintiff's spine at C5, C6 and C7.  AR 594-95.  The

surgery eliminated Plaintiff's left arm pain and resolved the radiating pain to the fingers of the

right arm; however, Plaintiff still experienced some pain from the neck to the right elbow.   AR

594. By April 2017, Plaintiff's right arm pain had resolved.  AR 662.

## IV.    Standard of Review

    Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the

Commissioner denying a claimant disability benefits.  "This court may set aside the

Commissioner's denial of disability insurance benefits when the ALJ's findings are based on

legal error or are not supported by substantial evidence in the record as a whole."  *Tackett v.

Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).  Substantial evidence is evidence

within the record that could lead a reasonable mind to accept a conclusion regarding disability

status.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a scintilla, but less

than a preponderance.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation

omitted).  When performing this analysis, the court must "consider the entire record as a whole

and may not affirm simply by isolating a specific quantum of supporting evidence."  *Robbins v.

Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks

omitted).

    If the evidence reasonably could support two conclusions, the court "may not substitute its

judgment for that of the Commissioner" and must affirm the decision.  *Jamerson v. Chater*, 112

F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  "[T]he court will not reverse an ALJ's

decision for harmless error, which exists when it is clear from the record that the ALJ's error was

inconsequential to the ultimate nondisability determination."  *Tommasetti v. Astrue*, 533 F.3d

1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

///

///

## V.     The Disability Standard

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

> 42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability.  20 C.F.R. §§ 416.920(a)-(f).  The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled.  20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level.  20 C.F.R. § 416.920(a)-(f).

## VI.     Summary of the ALJ's Decision

The Administrative Law Judge found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of March 10, 2014.  AR 12.  His severe impairments included: multiple sclerosis; cervical spine degenerative disk disease, status post fusion in December 2016; lumbar spine degenerative disk disease; and, depression.  AR 13.  None of the severe impairments met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).  AR 13.

///

The ALJ concluded that Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b), except he could no more than occasionally operate hand controls with his bilateral upper extremities. AR 15. He could never climb ladders, ropes or scaffolds; occasionally stoop, kneel, crouch and crawl; and, frequently balance and climb ramps and stairs. AR 15. He could reach overhead no more often than occasionally. AR 15. Plaintiff should avoid concentrated exposure to extreme heat, extreme cold, unprotected heights and moving mechanical parts. AR 15. He was limited to simple, routine and repetitive tasks. AR 15.

Plaintiff was unable to perform his past relevant work. AR 19. However, considering Plaintiff's age, education, work experience and residual functional capacity jobs that he could perform existed in significant numbers in the national economy. AR 20. Accordingly, the ALJ found that Plaintiff was not disabled at any time from March 10, 2014, the alleged onset date, through August 21, 2017, the date of the decision. AR 21.

## VII.    Reliability of Plaintiff's Testimony

Plaintiff contends that the ALJ erred in concluding that his testimony was inconsistent with objective medical evidence in the record. The Commissioner responds that the ALJ appropriately focused his analysis on the objective medical evidence, and not on Plaintiff's subjective allegations. Having reviewed the record as a whole, the Court agrees that Plaintiff's account of disabling pain and other symptoms was inconsistent with the objective medical evidence of his symptoms and treatment.

An ALJ is responsible for determining credibility, resolving conflicts in medical testimony and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). His or her findings of fact must be supported by "clear and convincing evidence." *Burrell v. Colvin*, 775 F.3d 1133, 1136-37 (9th Cir. 2014).

To determine whether the ALJ's findings are supported by sufficient evidence a court must consider the record as a whole, weighing both the evidence that supports the ALJ's determination and the evidence against it. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). "[A] federal court's review of Social Security determinations is quite limited." *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015). "For highly fact-intensive individualized

determinations like a claimant's entitlement to disability benefits, Congress places a premium upon agency expertise, and, for the sake of uniformity, it is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency." *Id.* (quoting *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014), quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 621 (1966)) (internal quotation marks omitted). Federal courts should generally "'leave it to the ALJ to determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record.'" *Brown-Hunter*, 806 F.3d at 492 (quoting *Treichler*, 775 F.3d at 1098).

A claimant's statements of pain or other symptoms are not conclusive evidence of a physical or mental impairment or disability. 42 U.S.C. § 423(d)(5)(A); Soc. Sec. Rul. 16-3p. "An ALJ cannot be required to believe every allegation of [disability], or else disability benefits would be available for the asking, a result plainly contrary to the [Social Security Act]." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

Social Security Ruling 16-3p applies to disability applications heard by the agency on or after March 28, 2016. Ruling 16-3p eliminated the use of the term "credibility" to emphasize that subjective symptom evaluation is not "an examination of an individual's character" but an endeavor to "determine how symptoms limit ability to perform work-related activities." S.S.R. 16-3p at 1-2.

An ALJ performs a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. *See Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996); S.S.R 16-3p at 3. First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged. *Garrison*, 759 F.3d at 1014; *Smolen*, 80 F.3d at 1281-1282. In this case, the first step is satisfied by the ALJ's finding that Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms." AR 16. The ALJ did not find Plaintiff to be malingering.

If the claimant satisfies the first step and there is no evidence of malingering, the ALJ must "evaluate the intensity and persistence of [the claimant's] symptoms to determine the extent

to which the symptoms limit an individual's ability to perform work-related activities." S.S.R. 16-3p at 2. "[S]ome individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence and the same non-medical evidence." S.S.R. 16-3p at 5. In reaching a conclusion, the ALJ must examine the record as a whole, including objective medical evidence; the claimant's representations of the intensity, persistence and limiting effects of his symptoms; statements and other information from medical providers and other third parties; and, any other relevant evidence included in the individual's administrative record. S.S.R. 16-3p at 5. "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p at *10.

Because a "claimant's subjective statements may tell of greater limitations than can medical evidence alone," an "ALJ may not reject the claimant's statements regarding her limitations merely because they are not supported by objective evidence." *Tonapetyan v. Halter*, 242 F.3d 1144, 1147-48 (2001) (quoting *Fair*, 885 F.2d at 602). *See also Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) (holding that when there is evidence of an underlying medical impairment, the ALJ may not discredit the claimant's testimony regarding the severity of his symptoms solely because they are unsupported by medical evidence). "Congress clearly meant that so long as the pain is *associated* with a clinically demonstrated impairment, credible pain testimony should contribute to a determination of disability." *Id.* (internal quotation marks and citations omitted).

However, the law does not require an ALJ simply to ignore inconsistencies between objective medical evidence and a claimant's testimony. "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); SSR 16-3p (citing 20 C.F.R. § 404.1529(c)(2)). As part of his or her analysis of the record as a whole, an ALJ properly

considers whether the objective medical evidence supports or is consistent with a claimant's pain testimony. *Id.*; 20 C.F.R. §§ 404.1529(c)(4), 416.1529(c)(4) (symptoms are determined to diminish residual functional capacity only to the extent that the alleged functional limitations and restrictions "can reasonably be accepted as consistent with the objective medical evidence and other evidence"). The ALJ did so here, finding that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with medical evidence and other evidence in the record for the reasons explained in this decision." AR 16.

"[O]bjective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities." S.S.R. 16-3p at 6. Because objective medical evidence may reveal the intensity, persistence and limiting effects of a claimant's symptoms, an ALJ must consider whether the symptoms reported by a claimant are consistent with medical signs and laboratory findings of record. *Id.* For example, "reduced joint motion, muscle spasm, sensory deficit, and motor disruption illustrate findings that may result from, or be associated with, pain." *Id.* Conversely, records indicating that a claimant has no muscle wasting bely a claimant's representation that he or she has been unable to walk no more than a few steps per day. *Id.*

Here, the ALJ began his analysis by contrasting Plaintiff's claims that he was unable to perform any work activity with objective medical records documenting Plaintiff's symptoms, diagnoses and treatment; the progression of Plaintiff's multiple sclerosis; and, Plaintiff's failure to comply with his neurologists' instructions for follow-up appointments:

> In terms of the claimant's alleged physical symptoms, the record reflects that he was referred to a neurologist in January 2013 for back pain, blurry vision, intermittent numbness in the right fingers and migraine headaches a few times per month. Consequently, he was diagnosed with multiple sclerosis and decided to start treatment with injectable copaxone. Following an appointment in August 2013 at which he was instructed to return in three months, he did not return for follow-up until November 2014, at which time he reported having no multiple sclerosis-like attacks but continued to have fatigue and intermittent paresthesia. In addition, MRI scans of the brain, cervical spine and lumbar spine in October 2014 had shown no new lesions.

> The examining neurologist instructed him to follow up in four months, but he did not show to his March 2015 appointment and returned in October 2015, at which time he stated he had been doing pretty well on the copaxone injections, had not had any multiple sclerosis-like attacks, and his strength had dramatically improved over the past month. Indeed, examination noted intact sensation, intact gait with good arm swing and steady turn, and negative Romberg test. Notably the record is devoid of further records.

AR 16 (citations to record omitted).

As summarized in the Factual Background above, the ALJ's account of Plaintiff's treatment was accurate. In his testimony, Plaintiff dismissed his failure to continue regular treatment claiming that the UCLA specialists were three hours from his home and he was unable to find a neurologist nearby.[7] AR 67, 74.

The ALJ next considered the medical evidence relating to the degenerative disk disease of Plaintiff's cervical spine. AR 16-17. Because of Plaintiff's severe pain, bilateral arm radiculopathy and weakness, cervical degeneration and stenosis, Plaintiff's underwent cervical fusion in December 2016. AR 16. By April 2017, Plaintiff told his surgeon that his pain had improved 60 percent in the left arm, 50 percent in the right arm, and 60 to 80 percent in his neck, although he still experienced some triggering in his right hand. AR 16-17. Subsequent imaging indicated that the fusion was progressing well with good positioning of hardware and only mild degeneration. AR 17. At the same time, examination, testing and imaging indicated that Plaintiff's lumbar spine was stable and did not preclude Plaintiff's performing light work. AR 17.

Plaintiff's initial mental health evaluation was within normal limits except for impaired attention span and concentration, and subsequent evaluations were unremarkable. AR 17. The ALJ acknowledged Plaintiff's acute mental health crisis which required emergency room treatment in October 2014 after Plaintiff threatened his wife in the course of a marital argument. AR 17. Emergency room personnel treated Plaintiff and released him the same day.[8] AR 547.

---

[7] Nothing in the record addresses Plaintiff's failure to return to his initial neurologist, Dr. Shanmugam, who had referred him to UCLA for consultation and whose office was located significantly closer to Plaintiff's home.

[8] Notably, in November 2014, Plaintiff represented to Dr. Wilson that he had a "mental breakdown" requiring hospitalization after his wife left him. AR 681. Emergency room records indicate that Mrs. McMillen brought Plaintiff to the emergency room and explained the circumstances of his agitation and inappropriate behavior. AR 545. She later took him home. AR 546. The record neither documents any other hospitalization for mental health treatment, nor provides any further details of Mrs. McMillen's decision to leave the family home with the family's three young children.

The ALJ concluded that Plaintiff's depression was adequately addressed in Plaintiff's residual functional capacity, which limited him to simple work.  AR 17.

Finally, the ALJ considered how little treatment Plaintiff had sought and received in contrast to the severe impairments he alleged.  AR 17.  Although the medical records indicated that Plaintiff experienced some side effects in the course of his treatment, he testified at the hearing that he was then only experiencing drowsiness.[9]  AR 17.  In addition to the repeated objective reports that Plaintiff's condition was stable, the ALJ noted that the Plaintiff's medications and dosages had changed little from 2012 to 2017.  AR 17.  The ALJ wrote:

> If his impairments were so severe that he is unable to work as he alleges, I would expect that he would seek additional treatment, However, the record contains scant evidence of any such care. Indeed, as noted above, his medical records show large, unexplained gaps in treatment.  These appear to be inconsistent with the allegations of severe, painful, and debilitating conditions.  In sum, his treatment history is inconsistent with an alleged inability to perform all work activity.

AR 17-18.

In assessing a claimant's credibility, an ALJ may properly rely on "unexplained or inadequately explained failure to seek treatment or follow a prescribed course of treatment." *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012).   A claimant's failure to assert a good reason for not seeking treatment or for failing to follow a prescribed course of treatment or an ALJ's finding that the proffered reason is not credible, cast doubt on the sincerity of the claimant's testimony.  *Fair*, 885 F.2d at 603.  "[I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that may improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record."  SSR 16-3p at 9.

Finally, the ALJ examined evidence documenting Plaintiff's ability to perform his own personal care, prepare his daily meals, take out the trash, drive locally, handle finances, attend his

---

[9] The ALJ did not acknowledge the recommendations of Dr. Tankou and Dr. Wilson that Plaintiff reduce or stop taking pain medications with sedating effect.  AR 427, 683.  Nor did he consider Dr. Orth's comment concerning Plaintiff's opiate dependency or Plaintiff's disclosure to Dr. Del Rosario that, in addition to his prescription medications, he was consuming four alcoholic drinks daily.  AR 57, 534.

children's sporting events, socialize with friends and family, and care for his pets and children with his wife's help. AR 18. Finding that Plaintiff engaged in reasonably normal activities, the ALJ observed, "While activities of daily living do not prove the claimant's ability to perform work activity, neither do they support his allegations of disabling pain and depression, and lack of ability to perform work activity." AR 18

Plaintiff's failure to comply with medical treatment and recommendations, discontinuance of treatment with a neurologist. and evidence of his ability to provide his own personal care and engage in a wide range of activities undermine his allegations of total disability. *See* S.S.R. 16-3p at 7-9. As is always the case in an appeal of the Commissioner's denial of disability benefits, Plaintiff would construe the evidence differently than the ALJ. Nonetheless, the hearing decision sets forth sufficient evidence in the record to support the ALJ's determination that Plaintiff's representations to the agency were not fully consistent with the medical evidence of record. The Court therefore will not second guess the ALJ's assessment of Plaintiff's credibility.

**VIII.** **No Further Development of the Record Was Required**

Based on neurologist Dr. Orth's testimony that the record was insufficient for him to form a medical opinion of Plaintiff's residual functional capacity, Plaintiff contends that the ALJ should have further developed the record by securing a consultative examination by a neurologist as Dr. Orth suggested. The Commissioner counters that sufficient evidence was included in the record to determine disability and that evidence was neither ambiguous or unclear.

**A.** **Neurological Expert Testimony**

The Court interprets Dr. Orth's testimony differently than Plaintiff. In the portion of testimony cited by Plaintiff, Dr. Orth noted Plaintiff's lack of neurological treatment after his 2015 appointment at UCLA and indicated that he could not analyze progression of Plaintiff's multiple sclerosis without the records of periodic neurological examinations and testing:

> Q        So, doctor, were you able to review up through about 27 F [AR 680-86] in the file?
>
> A        I was, your honor.
>
> Q        Okay. And is that sufficient for you to have formed medical opinions within your area of specialty?

A       Not really, your honor.  I mean, I'm missing the – the last records I have from UCLA are back in October of 2015.

Q       Uh-huh.

A       I have no – did he have any – in October of 2015 there was a repeat brain and [inaudible] scan which showed no additional findings regarding his MS.  So, I have no additional MRI findings in [inaudible] since October of [inaudible] show any progression.  And I don't have the neurologic evaluation by the UCLA staff since October of '15 that show progression for his symptoms.  In October of '15 his neurologic examination was unchanged . . . . .

AR 46-47.

In addition, at the close of the doctor's testimony, Plaintiff's attorney asked Dr. Orth whether he would recommend a "consultative examination" for the claimant and if so, by what specialty.  AR 56.  Dr. Orth replied, "He should go back to UCLA neurology and let them do a repeat [inaudible] it's my understanding the last time he was seen by them was 2015."  AR 56.  The attorney then repeated Plaintiff's claim that he lived in a remote area, and again asked Dr. Orth to what type of consultative expert "we" should send Plaintiff.  AR 56.  Dr Orth replied:

A       Oh, I recommend a neurology examination because what we are concerned about is MS, okay?  He's not disabled on the basis [inaudible] –

Q       All right.

A       --cervical or lumbar spine.  So, the only way claimant can obtain disability is based on his MS, and we don't have that in the exhibits, the last two years.  So he needs a neurologist [inaudible].  He also has developed a dependency on opiates in the last four years, so that's another factor [inaudible].

AR 57.

Plaintiff's attorney continued to press Dr. Orth for an opinion that Plaintiff's impairments rendered him disabled.  Dr. Orth repeated that Plaintiff's cervical and lumbar spine impairments did not render him unable to perform work, and that further neurological evaluation would be necessary to establish impairment from multiple sclerosis.  AR 57-58.

**B.  Plaintiff's Motion for a Consultative Examination**

The ALJ also interpreted Dr. Orth's testimony as indicating the need for regular treatment to observe the progression of Plaintiff's multiple sclerosis symptoms.  At the end of the

17

administrative hearing, Plaintiff's attorney requested a consultative examination arguing that Plaintiff had not seen a neurologist since 2015 because he lived three hours from UCLA and that Dr. Orth was unable to render an opinion on Plaintiff's residual functional capacity without an updated examination. AR 90. The ALJ denied the motion:

> I'm not going to order that. There's a few reasons for it. The remoteness doesn't fly with me because all the treatment is 50 miles from his home anyway. It is only two hours to metro Los Angeles, less to the San Fernando Valley . . . the remoteness doesn't work on the lack of medical treatment, particularly where the treating physicians are all 50 miles from the claimant's house anyway . . . There's simply a lack of treatment . . . ***And technically the doctor said there was no treating physician exam. So, at this point, you know, without the treatment it is what it is and I don't see the reason for it.*** You know, Mr. McMillen's going to other types of doctors, so that's not – and I'll note for the record that even in the 2015 that you're citing me to, he didn't go for a full year. He missed the six month's follow-up and then there was no change over that time, so I did note that in those UCLA records. So, it's not even like he was engaging in a lot of neurological treatment anyway, and the conclusion was that the issues were orthopedic, okay? So we're not going to do a CE . . . at this late date I don't see the value of a CE given that there's no – there's been no subsequent treatment, doesn't tell us anything without the treatment notes.

AR 90-91 (emphasis added).

### C, <u>Legal Standard</u>

A claimant generally bears the burden of proving his or her entitlement to disability benefits. *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001); 20 C.F.R § 404.1512(c). But Social Security hearings are not adversarial proceedings. *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991). Whether or not the claimant is represented by counsel, the ALJ "must inform himself about the facts relevant to his decision." *Heckler v. Campbell*, 461 U.S. 458, 471 n. 1 (1983). "The ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983). *Accord Tonapetyan*, 242 F.3d at 1150; *Smolen*, 80 F.3d at 1288. However, the ALJ's obligation to obtain additional evidence is triggered only when the evidence from the treating medical source is ambiguous or inadequate to evaluate the evidence of the claimant's disability. *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002); *Tonapetyan*, 242 F.3d at 1150.

///

In this case, the evidence is inadequate only because Plaintiff completely stopped seeing a neurologist after the October 2015 appointment at UCLA. As discussed in the factual statement above, Plaintiff experienced substantial pain relief following successful orthopedic surgery to fuse his cervical spine. Dr. Orth opined that following surgery Plaintiff no longer experienced the pain and disfunction of his upper extremities that had led to the discovery of Dawson's fingers and apparent demyelination diagnosed as multiple sclerosis. In fact, Plaintiff discontinued treatment claiming that UCLA was too far to travel but did not explain why he did not return to Dr. Shanmugam, the neurologist who had referred him to UCLA for resolution of incongruities between Plaintiff's physical symptoms and the typical symptoms of multiple sclerosis. In the absence of continued treatment, there was no evidence of any functional impairment attributable to multiple sclerosis nor any documented basis by which Dr. Orth could confirm the multiple sclerosis diagnosis and evaluate the progression of the disease.

"The claimant bears the burden of proving steps one through four, consistent with the general rule that '[a]t all times, the burden is on the claimant to establish his entitlement to disability insurance benefits.'" *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007) (quoting *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998)). To determine whether a claimant has carried his burden of proof, the ALJ must evaluate the evidence "with due consideration for credibility, motivation, and medical evidence of impairment." *Gray v. Matthews*, 421 F.Supp. 364, 367 (N.D.Cal. 1976) (quoting *Dibble v. Finch*, 316 F.Supp 1304, 1309 (W.D. Pa 1970)). When an ALJ has "acted in accordance with his responsibility to determine the credibility of medical evidence" and given specific and legitimate reasons for his determination, he did not err in failing to secure additional medical evidence. *Thomas*, 278 F.3d at 958. When the ALJ finds support in the record adequate to determine the claimant's disability, she is not required to secure an additional or consultative opinion. *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005).

### IX. Sufficient Evidence Supported the ALJ's Determination

Plaintiff contends that the determination of Plaintiff's residual functional capacity was not supported by sufficient evidence. The Commissioner disagrees. After carefully reviewing the

///

administrative record and the ALJ's analysis, the Court concludes that substantial evidence supported the ALJ's determination of Plaintiff's residual functional capacity.

### A. Medical Opinions

#### 1. Agency Physicians

On initial review, Robert Hughes, M.D., opined that Plaintiff could occasionally lift twenty pounds and frequently lift ten pounds; stand or walk about six hours in an eight-hour work day; and, sit about six hours in an eight-hour work day. AR 99. Plaintiff could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl, but never climb ropes, ladders or scaffolds. AR 99. He had no manipulative, visual or communicative limitations. AR 99-100. Plaintiff had no environmental limitations except to avoid concentrated exposure to heat and cold and avoid all exposure to hazards. AR 100. On reconsideration, E. Christian, M.D., agreed. AR 111-12.

#### 2. Medical Source Statement: Primary Care

##### a. Disability Impairment Questionnaire

In a disability impairment questionnaire dated August 12, 2015, Dr. Kumar indicated that Plaintiff's diagnoses included multiple sclerosis, lower back pain, cervical spine pain and left leg osteo arthritis. AR 509. Multiple sclerosis caused numbness, weakness and constant pain in the arms, hands, legs, feet, back and neck, which were not controlled by medication. AR 510. Plaintiff's medications included Nucynta,[10] Norco,[11] Oxycontin,[12] Ativan[13] and Zanaflex.[14] AR 510.

///

---

[10] Nucynta (Tapentadol) is an opiate drug used to treat moderate to severe acute pain. www.medlineplus.gov/druginfo/meds/a610006.html (accessed December 4, 2019).
[11] Norco (Acetaminophen and Hydrocodone) is a combination drug prescribed to relieve moderate to severe pain. www.medlineplus.gov/druginfo/meds/a601006.html (accessed December 4, 2019).
[12] Oxycontin (Oxycodone) is an opiate drug prescribed to treat moderate to severe pain. www.medlineplus.gov/druginfo/meds/a682132.html (accessed December 4, 2019).
[13] Ativan (Lorazepam) is a benzodiazepine prescribed to relieve anxiety. www.medlineplus.gov/druginfo/meds/a682053.html (accessed December 4, 2019).
[14] Zanaflex (Tizanidine) is a skeletal muscle relaxant prescribed to relieve the spasms and increased muscle tone cause by multiple sclerosis. www.medlineplus.gov/druginfo/meds/a601121.html (accessed December 4, 2019).

Dr. Kumar opined that Plaintiff could sit about two hours and stand or walk about one hour in an eight-hour workday. AR 511. When sitting, Plaintiff needed to get up for thirty minutes every thirty minutes. AR 511. Plaintiff did not need to elevate his legs. AR 511. Plaintiff could occasionally lift from zero to twenty pounds. AR 511. Plaintiff should never or rarely perform reaching, handling or fingering. AR 512. He should not participate in a competitive work environment because he "can strain himself with any wrong movement." AR 512. Plaintiff would frequently experience pain in the course of a normal work day and would likely need to rest for 30 to 60 minutes every 30 to 50 minutes. AR 512. His symptoms would be intensified by his anxiety. AR 513. Plaintiff would likely miss more than three days of work monthly. AR 513.

### b. **Prescription Blank Statement**

On July 17, 2015, Dr. Kumar wrote on a prescription blank bearing Plaintiff's name: "This patient is currently diagnosed with MS, Anxiety, Depression and is Completely Disabled." AR 668.

### c. **"To Whom It May Concern"**

On March 3, 2017, Dr. Kumar issued a letter addressed "To Whom It May Concern," which read:

> My patient has a diagnosis of MS and relevant conditions that are severe, Osteoarthritis, Lumbar and Cervical pain. He underwent surgery on December 15, 2016 of his Cervical Spine. He is permanently and totally disabled.
>
> Due to his current medical conditions/disabilities he is to avoid continuous sitting, standing or walking as it may increase his symptoms and worsen his condition.
>
> It is also medically necessary for him to avoid stressful situations as it may cause a relapse or worsening of his MS conditions. Emotional factors such as anxiety can contribute to the severity of his symptoms and functional limitations.
>
> In my opinion Mr. McMillen is totally and permanently disabled due to physical impairment. MS is a progressive neurological disorder. My expectation is that he will continue to decline in function over time.
>
> AR 677.

### d.     <u>Summary Impairment Questionnaire[15]</u>

The record includes a summary impairment questionnaire prepared by Plaintiff's counsel and completed by Dr. Kumar on August 4, 2017.  AR 39-40.  Dr Kumar began treating Plaintiff in November 2012 and saw Plaintiff monthly.  AR 39.  Plaintiff's diagnoses included multiple sclerosis, lower back fusion, low back pain and cervical fusion.  AR 39.  In an eight-hour work day, Plaintiff could sit, stand or walk less than one hour.  AR 40.  While sitting, Plaintiff should elevate his legs to waist level two to three times daily.  AR 40.  He could never or rarely reach, handle, finger or lift any weight.  AR 40.  As a result of his impairments, Plaintiff was likely to miss work more than three times per month.  AR 40.

### 3.     <u>Medical Source Statement: Psychology</u>

On October 27, 2017, while Plaintiff's appeal was pending before the Appeals Council, Plaintiff's treating psychologist LaRae C. Neal, Ph.D., completed a mental impairment questionnaire.  AR 28-32.  Dr. Neal had been treating Plaintiff since August 11, 2017.[16]  AR 32.

Plaintiff's symptoms included depressed mood, hostility or irritability, anxiety due to condition, intrusive recollections of a traumatic experience, anhedonia/pervasive loss of interest, decreased energy, motor tension, social withdrawal or isolation and sleep disturbance due to constant pain.  AR 29.  Dr. Neal diagnosed multiple sclerosis, anxiety due to multiple sclerosis and major depression-severe.  AR 28.  She wrote:

> Client['ls symptoms are severe and unmanageable, and interfere with [client's] social, occupational and physical functioning[.]  Based on psychological testing, client's scores were in the severe category[.]  Reports constant pain which increases his negative mental status.  H[e]ightened levels of anxiety & severe depression.

AR 28.

In Dr. Neal's opinion, Plaintiff had no or mild limitations in getting along with co-workers or peers without distracting them and adhering to basic standards of neatness.  AR 31.  Plaintiff had moderate impairments in carrying out simple one-to-two step instructions; sustaining ordinary routine without supervision; working in coordination with or near others without being

---

[15] The ALJ ruled that this opinion was inadmissible since it was not proffered until the hearing.  AR 45.
[16] No treatment notes from Dr. Neal appear in the administrative record.

distracted; interacting appropriately with the public; and, maintaining socially appropriate behavior. AR 31. He had moderate-to-marked impairment in remembering locations and work-like procedures; understanding and remembering one-to-two step instructions; making simple work-related decisions; accepting instructions and responding appropriately to criticism from supervisors; being aware of hazards and taking appropriate precautions; and, making plans independently. AR 31. Plaintiff had marked impairment in understanding and remembering detailed instructions; carrying out detailed instructions; performing activities within a schedule and being consistently punctual; completing a work day without interruption from psychological symptoms; performing at consistent pace without rest periods of unreasonable length or frequency; asking simple questions or requesting assistance; responding appropriately to workplace changes; traveling to unfamiliar places or using public transportation; and, setting realistic goals. AR 31. On some days, Plaintiff experienced extreme anxiety and irritability due to physical impairments such as getting out of bed, standing or sitting. AR 32. Due to his impairments and treatment, Plaintiff was likely to be absent from work more than three times per month. AR 32.

### 4. Medical Source Statement: Psychiatry

Dr. Del Rosario diagnosed Plaintiff with major depression. AR 521. Symptoms included depressed mood, persistent or generalized anxiety, feelings of guilt or worthlessness, hostility or irritability, obsessions, difficulty thinking or concentrating, easy distractibility, poor immediate memory, recurrent panic attacks, anhedonia/pervasive loss of interest, motor tension, appetite disturbances/weight change, decreased energy, psychomotor retardation, social withdrawal or isolation, and sleep disturbances. AR 522. Plaintiff's psychiatric conditions exacerbated his neck and back pain. AR 523. Episodes of decompensation or deterioration in a work setting would result in serious mood instability. AR 523. Plaintiff was likely to miss work more than three times monthly. AR 525.

In Dr. Del Rosario's opinion, Plaintiff had moderate-to-marked limitations in carrying out simple one or two step instructions; interacting appropriately with the public; maintaining socially appropriate behavior; adhering to basic standards of neatness, travel to unfamiliar locations or

using public transportation; and, making plans independently. AR 524. Plaintiff had marked

limitation in remembering locations and work-like procedures; understanding and remembering

one or two step or detailed instructions; carrying out detailed instructions; maintaining attention

and concentration for prolonged periods; performing activities within a schedule and being

punctual; sustaining ordinary routine without supervision; working in coordination with or near

others without being distracted by them; making simple work-related decisions; completing a

work day without interruptions from psychological symptoms; performing at a consistent pace

without rest periods of unreasonable length or frequency; asking simple questions or requesting

assistance; accepting instructions and responding appropriately to criticism from supervisors;

getting along with co-workers or peers without distracting them; responding appropriately to

workplace changes; being aware of hazards and taking appropriate precautions; and, setting

realistic goals. AR 524.

### 5.     **Medical Source Statement: Ophthalmology**

Dr. Sampson reported that Plaintiff had uncorrected distance vision of 20/25 bilaterally

and required annual monitoring. AR 502-03.

### 6.     **Expert Testimony: Neurology**

Neurologist O. Gerald Orth testified at the hearing as a medical expert. AR 45-58. He

had reviewed Plaintiff's medical records through October 2015. AR 46. Although significant

portions of his testimony were inaudible, the ALJ summarized the doctor's initial testimony as

indicating that no change in Plaintiff's neurologic exams or symptoms occurred after October

2015. AR 48. The resolution of Plaintiff's symptoms following cervical spine fusion indicated

that orthopedic impairments, not multiple sclerosis, caused Plaintiff's symptoms. AR 48-49. Dr.

Orth opined that Plaintiff was not disabled (1) based on the orthopedic problems in his cervical

and lumbar spine and, (2) in the absence of neurological testing to confirm his multiple sclerosis

diagnosis. AR 57.

Dr. Orth declined to opine further on Plaintiff's functional limitations since Plaintiff's

medical records did not clearly articulate the findings of a physical examination or establish a

need for the cervical fusion. AR 55. In addition, Plaintiff had not sought further neurologic

24

treatment following his November 2015 appointment at UCLA, preventing Dr. Orth from confirming the diagnosis and evaluating the progression of the disease.  AR 46-47.

**B.      Determining Residual Functional Capacity**

"Residual functional capacity is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p.  The residual functional capacity assessment considers only functional limitations and restrictions which result from an individual's medically determinable impairment or combination of impairments.  SSR 96-8p.

A determination of residual functional capacity is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner. See 20 C.F.R. §§ 404.1527(d)(2) (RFC is not a medical opinion), 404.1546(c) (identifying the ALJ as responsible for determining RFC). "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity." *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001).  In doing so the ALJ must determine credibility, resolve conflicts in medical testimony and resolve evidentiary ambiguities.  *Andrews*, 53 F.3d at 1039-40.

"In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins*, 466 F.3d at 883.  *See also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence).  "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

The opinions of treating physicians, examining physicians, and non-examining physicians are entitled to varying weight in residual functional capacity determinations. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual.  *Id.*; *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).  The opinion of an examining physician is,

in turn, entitled to greater weight than the opinion of a non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990). An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a contradicted opinion of a treating professional may be rejected for "specific and legitimate" reasons. *Id.* at 830. However, the opinions of a treating or examining physician are "not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).

## C. The ALJ Properly Analyzed Evidence in the Record as a Whole

"[A]n ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Magallanes*, 881 F.2d at 750. An ALJ may choose to give more weight to opinions that are more consistent with the evidence in the record. 20 C.F.R. §§ 404.1527(c)(4) ("the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion").

The ALJ's analysis began at step three when the ALJ considered whether Plaintiff's alleged physical impairments met or equaled a listed impairment (*see* 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526)). AR 13. The ALJ briefly indicated that objective medical evidence did not establish that any alleged physical impairment met any condition listed in Appendix 1. AR 13-14.

The ALJ's discussion of Plaintiff's mental impairments was longer since the ALJ carefully considered each component of Listing 12.04, which addresses depressive, bipolar and related disorders. AR 14. The ALJ gave little weight to Dr. Del Rosario's opinion that Plaintiff "had marked limitations in his ability to perform virtually all mental activities." AR 14. He found the opinion brief and conclusory with few clinical findings to support it. AR 14. In fact, records of Dr. Del Rosario's treatment of Plaintiff largely showed normal mental status reports. AR 24. In contrast, the ALJ discussed in detail Plaintiff's own representation of his abilities and limitations and concluded that Plaintiff had moderate limitations in understanding, remembering or applying information; mild limitations in interacting with others; moderate limitations of

///

concentration, persistence and pace; and, mild limitations in adapting and managing himself.   AR 14-15.

Moving on to analyze evidence of Plaintiff's residual functional capacity at step four, the ALJ found that Plaintiff's testimony regarding his symptoms was not fully consistent with the objective medical records.  AR 15-18.  *See* full discussion in Issue VII above.

The ALJ gave great weight to the opinions of the state agency physicians that Plaintiff was able to perform a full range of light work with postural and environmental limitations.  AR 18.  "However, based on evidence received at the hearing level, which the consultants did not have the opportunity to review," the ALJ found Plaintiff to have greater limitation in some postural and manipulative activities than would have been apparent to the agency physicians.  AR 18.

The ALJ gave some weight to Dr. Kumar's opinion that Plaintiff could lift and carry up to twenty pounds, but little weight to the opinion that Plaintiff could only stand or walk one hour and sit two hours in an eight-hour work day, and was unable to use his hands and arms.  AR 18.  "The extreme limitations [we]re not supported by the doctor's treatment records, which do not document significant clinical abnormalities and show that [Dr. Kumar] only instructed [Plaintiff] to take medications for back pain."  AR 18.  Further, the ALJ rejected Dr. Kumar's March and July 2015 opinions to the extent that each concluded that Plaintiff was completely disabled, a determination reserved to the Commissioner (20 C.F.R. § 404.1527(e)).  AR 18.

Returning to his step-two analysis of Dr. Del Rosario's psychiatric opinion, the ALJ repeated his determination to give little weight to the psychiatrist's opinion that Plaintiff had marked limitation in his ability to perform nearly all mental activities.  AR 19.  Nonetheless, in light of Plaintiff's subjective complaints, his having pursued psychiatric help and his use of psychotropic medications, the ALJ concluded that Plaintiff was limited to performing simple work.  AR 19.

"[A]n ALJ is responsible for determining credibility and resolving conflicts in medical testimony."  *Magallanes*, 881 F.2d at 750.  He properly determines the weight to be given each medical opinion by considering the evidence in the record as the ALJ did here.  20 C.F.R. §

404.1527(c)(4) ("the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion").  The record must include objective evidence to support the medical opinion of the claimant's residual functional capacity.  *Meanel v. Apfel*, 172 F.3d 1111, 1113-14 (9th Cir. 1999).  Inconsistencies with the overall record or with a physician's own notes are a valid basis to reject a medical opinion. *Molina v. Astrue*, 674 F.3d 1104, 1111-1112 (9th Cir. 2012) (recognizing that a conflict with treatment notes is a germane reason to reject a treating physician's assistant's opinion); *Connett v. Barnhart,* 340 F.3d 871, 875 (9th Cir. 2003) (rejecting physician's opinion when treatment notes provide no basis for the opined functional restrictions); *Tommasetti*, 533 F.3d at 1041 (incongruity between questionnaire responses and the Plaintiff's medical records is a specific and legitimate reason for rejecting an opinion); *Valentine v. Comm'r of Soc. Sec. Admin*., 574 F.3d 685, 692-693 (9th Cir. 2009) (holding that a conflict with treatment notes is a specific and legitimate reason to reject a treating physician's opinion).

The Court is not required to accept Plaintiff's characterization of his treatment records. The ALJ fully supported his determination based on multiple medical and psychological opinions and the evidence of record.

Even if this Court were to accept that the record could support Plaintiff's opinion, the record amply supports the ALJ's interpretation as well.  When the evidence could arguably support two interpretations, the Court may not substitute its judgment for that of the Commissioner.  *Jamerson*, 112 F.3d at 1066.

## X.    Conclusion and Order

Based on the foregoing, the Court finds that the ALJ's decision that Plaintiff is not disabled is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision

///

///

of the Commissioner of Social Security. The Clerk of Court is directed to enter judgment in favor of Defendant Andrew Saul, Commissioner of Social Security, and against Plaintiff William John McMillen IV.

IT IS SO ORDERED.

Dated:   **December 16, 2019**                        **/s/ Gary S. Austin**
UNITED STATES MAGISTRATE JUDGE